**KAZ MANUFACTURING CO., INC., Plaintiff,**

v.

**NORTHERN ELECTRIC CO., Defendant.**

No. 73 Civ. 2766 (WCC).

United States District Court, S. D. New York.

Feb. 20, 1976.

Kenneth S. Goldfarb, New York City, for plaintiff.

Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., for defendant; Walther E. Wyss, Chicago, Ill., Layton &

Sherman, Robert Layton, New York City, Neil M. Rose, Chicago, Ill., of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This is an action for alleged infringement of three patents owned by plaintiff and relating to electric vaporizers. The action was tried without a jury and this opinion incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52(a) F.R.Civ.P.

## FACTUAL BACKGROUND

*The parties, the patents in suit and the issues*

Plaintiff, Kaz Manufacturing Co., Inc. (Kaz), is a New York corporation engaged in the manufacture and sale of humidifiers and vaporizers and having its principal offices in New York City.

Defendant, Northern Electric Co. (Northern), is a Delaware corporation engaged in the manufacture and sale of household electrical appliances, including humidifiers and vaporizers, and having a regular and established place of business in New York City and within this District, where it sells the vaporizers charged to infringe the patents in suit.

This Court has jurisdiction of the subject matter and of the parties.

The three patents in suit are:

U.S. Patent No. 3,610,879 (the '879 patent) issued October 5, 1971, in the names of Lawrence Katzman and Edward Briggin on an application filed December 15, 1969;

U.S. Patent No. 3,705,415 (the '415 patent) issued December 5, 1972, in the names of Katzman and Briggin on an application filed February 8, 1971 as a continuation-in-part of the application for the '879 patent, with a terminal disclaimer having been filed in the Patent Office disclaiming all the portion of the term of the '415 patent subsequent to October 4, 1988, the expiration date of the '879 patent;

U.S. Patent No. 3,714,391 (the '391 patent) issued January 30, 1973, in the names of Katzman and Briggin on an application filed September 28, 1971 as a continuation-in-part of the applications for both the '879 and '415 patents.

The entire right, title and interest in and to all three patents, including the right to bring suit for infringement thereof, has been assigned to Kaz.

Kaz initially charged that Northern's vaporizers Models 1301, 1302 and 1303 each infringes claims 3, 6 and 7 of the '879 patent, claims 1, 2 and 4 of the '415 patent and claims 1, 2 and 3 of the '391 patent; however, during the trial it conceded that the Model 1302 does not infringe claims 6 and 7 of the '879 patent and claim 2 of the '391 patent. It makes no charge of infringement as to the remaining claims of said patents.

Northern denies the infringement of any of the claims in suit by any of the accused devices, and contends that the claims are invalid either as substantially anticipated by the prior art, 35 U.S.C. § 102, or as obvious in view thereof, 35 U.S.C. § 103, and further contends that both the '415 and '391 patents are invalid for double patenting, despite the terminal disclaimer filed in connection with the '415 patent, because all three patents in suit claim the identical invention.

*The recent history of the art*

Electric vaporizers have been marketed for many years, the most popular type operating on the principle of electrolysis, having two spaced electrodes immersed in an electrolyte usually comprising ordinary tap water, with its conductivity enhanced, if necessary, by added materials such as a pinch of table salt, and with the electrodes connected to opposite terminals of a source of electrical power, such as ordinary household alternating current. The heat energy generated by electrical conduction through the water converts it to vapor or steam. Among the principal manufactures of such vaporizers in addition to the parties to this litigation are Hankscraft Company of Reedsburg, Wisconsin

and The DeVilbiss Company of Toledo, Ohio.

Prior to 1969 these vaporizers generally comprised a glass or, more recently, plastic bowl or reservoir for containing about a gallon or more of tap water to be vaporized. The reservoir had at the top a water inlet opening which was closed during use by a cover or cap from which depended the spaced electrodes housed within a small heating chamber made of heat resistant electrical insulating material, such as a thermoplastic resin. When the cap was placed on the water-filled container, the heating chamber was immersed in the water and small openings in the bottom of the heating chamber allowed a restricted flow of water from the reservoir into the chamber to replace that which was vaporized. The steam or vapor generated in the heating chamber was discharged through an aperture in the cap.

Representative vaporizers of the pre-1969 vintage, as marketed by the principal U.S. manufacturers of vaporizers, are disclosed in their following patents:

Conlin, et al., U.S. patent 3,020,385 (granted February 6, 1962) assigned to Hankscraft Company;

Fenstermaker, U.S. patent 3,308,267 (granted March 7, 1967) assigned to The DeVilbiss Company;

Katzman et al., U.S. patent 3,319,046 (granted May 9, 1967), assigned to Kaz.

Beginning at least as early as May 13, 1965, Underwriters' Laboratories, Inc. (UL), became concerned because of safety hazards in the use of such vaporizers, including the high temperature of the water in the reservoir portions of these vaporizers. When they were operated for long periods of time, such as overnight in a bedroom, the water temperature in the reservoir rose to such high temperatures that if the vaporizer was accidentally upset, a not uncommon occurrence at a child's bedside, for example, splashing of the hot reservoir water could produce painful and even serious burns.

UL conducted a series of tests on the electrolytic vaporizers then on the market in the United States and found that the maximum temperature of the water in the reservoir varied between 167°F. and 194°F. On May 13, 1965, UL wrote to the manufacturers of electrolytic vaporizers, informing them that it was considering withdrawal of its listing of such vaporizers, an action tantamount to banning their sale in this country, and soliciting comments from the manufacturers before taking such action. There ensued a series of meetings with industry representatives commencing in late August, 1965. These meetings were attended by representatives of the parties here, including Northern's Norbert Hernandez and Kaz's president Lawrence Katzman.

On February 14, 1969, UL issued a proposed revision of standards for electrolytic vaporizers, which provided that the temperature of the water in the reservoir must not exceed 115°F. Upon receipt of these tentative revisions, the vaporizer industry became aware that if they were adopted, all electrolytic vaporizers then on the market, with the possible exception of the DeVilbiss low-temperature vaporizer marketed under the name "Safety Sentinel," would require substantial redesign to meet this specification.

On February 16, 1969, UL had another meeting with the manufacturers, again attended by Hernandez for Northern and Katzman for Kaz. At that meeting, UL indicated that it was conducting further tests and, depending upon the results, would probably settle for a maximum reservoir water temperature of 130°F. rather than 115°F. as initially proposed.

By May 7, 1970, UL reported that it had completed these tests and had concluded that there was no burn hazard in the spilling of water at temperatures up to 130°F., and that the proposed 115°F. limit was definitely being raised to 130°F.

Finally, on December 2, 1970, UL issued new formal standards for electrolytic vaporizers to the effect that as of July 1, 1972 such vaporizers would not

be listed by UL unless the maximum reservoir water temperature did not exceed 130°F.

After the U.S. Department of Health, Education and Welfare complained about the length of time which UL had given to the industry for the development of low-temperature vaporizers and, following another meeting with industry representatives on August 17, 1971, UL on October 11, 1971 advanced the effective date of the new standard from July 1, 1972 to March 1, 1972.

*The patented inventions*

The '879 patent in suit, entitled "Insulating Heating Chamber for Vaporizers," discloses an electrolytic vaporizer of the general type sold by Kaz prior to 1969, but with two modifications: (1) the heating chamber is surrounded by a double-walled, air-filled insulating chamber, which likewise depends from the cover or cap, and (2) the bottom of the reservoir is provided with a pair of circular, upwardly extending ribs respectively engaging the inner and outer corners of the lower end of the insulating chamber. In the structures disclosed in the '879 patent, the insulating chamber and the heating chamber are integrally formed as a single unit, but with no common wall, except for a short distance at their upper ends. The interposition of the insulating chamber between the heating chamber and the reservoir retards heat transfer from the former to the latter by conduction, while the engagement of the ribs with the insulating chamber restricts the flow of liquid from the heating chamber to the reservoir and thus limits heat transfer by convection.

The '415 patent in suit, entitled "Vaporizer Bowl Construction," discloses several different forms of vaporizer, each similar to that of the '879 patent, except that the insulating chamber is made separate and removable from the cover and heating chamber assembly, the insulating chamber being provided at its upper end with a radially outwardly projecting horizontal supporting flange which overlies the edge of the opening in the top of the bowl, with the cap at least partially overlying this flange. The only advantage asserted for this separation of the heating and insulating chambers is the reduction of heat conduction between them.

The '391 patent in suit, entitled "Vaporizer with Thermally Insulated Heating Chamber," discloses several vaporizer constructions, including one (shown in Figure 1) which is identical with that disclosed in Figure 3 of the '415 patent. The claims of the '391 patent are directed to a vaporizer construction in which a wall of the insulating chamber which is separate from the heating chamber extends all the way from the bottom of the bowl to the cap. The '415 patent had disclosed but did not claim this feature.

*The making of the patented inventions*

In its answers to interrogatories, signed and verified by Lawrence Katzman, its president and a co-patentee of each of the patents in suit, Kaz claimed a conception date of August, 1969 for the inventions of all three of the patents in suit. However, after Northern, in attacking the validity of the patents, had relied on development work done for it by Norland Associates in July and early August, 1969, Kaz in its post-trial briefs asserted a conception date of July, 1969. However, the evidence adduced at the trial establishes no conception by the patentees of the inventions claimed in any of the patents in suit prior to October 17, 1969, the date of two sketches showing different types of one-piece heating and insulating chamber moldings for vaporizers embodying the construction disclosed and claimed in the '879 patent. Moreover, there is no evidence of building and successful testing of a device embodying either of these constructions prior to December 15, 1969, the date on which the application for the '879 patent was filed. Thus, for priority purposes, Kaz is restricted to that filing date for all subject matter disclosed in the '879 application as filed; for the subject matter disclosed for the first time in the applications for the '415

and '391 patents, Kaz is limited to the respective filing dates of those applications.

Kaz placed its low-temperature vaporizers incorporating the patented inventions on the market on October, 1971.

*Development of the accused Northern vaporizers*

When it became apparent to Northern in February, 1969 that UL approval of vaporizers would be withdrawn unless the temperature of the water in the reservoir, after long periods of use, did not exceed a level of the order of 115°F. to 130°F., Northern set about to develop a low temperature vaporizer.

On June 17, 1969, several representatives of Northern made a trip to Fort Atkinson, Wisconsin, to meet with Leo F. Perry and Dale G. Holinbeck of a research and development organization known as Norland Associates, Inc. (Norland) to explore the possibility of engaging Norland to assist in developing a low temperature vaporizer. As a result of this meeting, Norland made a proposal to Northern on June 20, 1969 for the performance of development and test work on such a vaporizer.

By a purchase order dated July 1, 1969, Northern authorized Norland to perform this work. On July 10, 1969, a number of employees of Northern met with Norland's Perry and Holinbeck. At this meeting, Norland was furnished with models of Northern's then current commercial vaporizers, including its Model 1219, copies of several prior patents on such devices and a model of the DeVilbiss "Safety Sentinel" low-temperature vaporizer, as later shown in the Corbett et al. U.S. patent 3,579,263, which employs an air-filled insulating chamber, and which maintains a water temperature no higher than about 125°F.

The major portion of Norland's work on this project was performed by Holinbeck, who made extensive tests and recorded the results in a bound notebook. By August 4, 1969, Holinbeck had built and tested a low-temperature vaporizer in which, after five hours of operation, the water temperature in the reservoir never exceeded 122°F. On August 12, 1969, Norland rendered a formal report on the work to date. The low-temperature vaporizer built and tested by Norland was a modified Northern Model 1219 vaporizer, with two additions: (1) a circular plastic ring was cemented to the inside of the bottom of the bowl, to form an upwardly projecting rib, and (2) a cylindrical insulating sleeve was adhesively secured at its upper end to the heating chamber to provide an air-filled insulating chamber surrounding the heating chamber and separating it from the reservoir. The lower end of the insulating sleeve engaged the rib in the bottom of the bowl and a check valve or opening was provided in the sleeve to permit a limited flow of water from the reservoir into the heating chamber. Among several variations suggested by Norland, one included an insulating chamber having no common wall with the heating chamber.

Pleased with Norland's success in the first phase of the work, Northern asked Norland to embark on a second phase of the project, which was completed and the results reported by December 30, 1969. The latter phase resulted in final design drawings of a vaporizer having a removable head with an air-filled insulating chamber surrounding the heating chamber, the insulating chamber being defined by the wall of the heating chamber and a single wall surrounding it, the latter extending to within ⅛ inch of the bottom of the bowl. This design was built and extensively and successfully tested.

After Norland's reports were reviewed by Northern's project engineer, the development of a production prototype was delayed pending adoption of final UL standards. Northern, in the meantime, continued to consider various alternative designs for such a prototype.

However, its competitor Hankscraft proceeded to place on the market its Model 202D which provided a maximum reservoir temperature, as measured by Northern, of 124° F.

In late 1970, Northern received from UL its final specifications which required compliance by July 1, 1972 (later changed to March 1, 1972) and which set the maximum water reservoir temperature at 130°F.

During the late 1960's, Northern had been selling three types of electrolytic vaporizers, Models 1219, 1259 and 1269, as well as several types of humidifiers, including the Model 96, which had a bowl similar to those of the vaporizers. To economize by making maximum use of its available tooling, Northern decided, instead of adopting the precise design of the unit developed by Norland, to use the reservoir bowl of its former Model 1269 in its new Model 1301, the bowl of its former Model 96 in its new Model 1302 and the bowl of its former Model 1259 in its new Model 1303.

All three new Northern models were designed to use the identical removable cap assembly with attached heating and insulating chambers and to provide a clearance of zero to .050 inch between the bottom of the outer wall of the insulating chamber and the upper surface of the bottom of the reservoir bowl. Since the bowl of Northern Model 96 humidifier to be used as the bowl for the new vaporizer Model 1302 was the shallowest of the three old bowls to be used in the new vaporizers, the length of the outer wall of the insulating chamber was chosen to provide the desired clearance from the bottom of that bowl, without any change in the bowl.

In order that the slightly deeper bowls previously used in the Northern Models 1269 and 1259 could become the bowls for the new Northern Models 1301 and 1303, respectively, and still maintain the desired zero to .050 inch clearance between the lower edge of the outer wall of insulating chamber and the bottom of the bowl, it was necessary to raise slightly the upper surface of the bottom of each of these two bowls.

In order to utilize the existing mold for the old Model 1269 to produce the bowl for Model 1301, a coaxial annular groove was machined into the mold to provide around the outer edge of the central, circular recessed portion of the bottom of the molded bowl a slightly raised annular ring. The same result could obviously have been produced by thickening the entire recessed portion of the bowl, but this would merely have wasted plastic material. The resulting raised ring has a height of less than 1/16 inch.

In order to produce the bowl for the Model 1303, the mold for the previous Model 1259 was modified by machining in it a circular recess to provide in the molded bowl a raised central plateau of less than 1/8 inch in thickness. Although this wasted some plastic, it was not deemed practical to provide only a raised annular ring, as was done in the bowl of the Model 1301, because of the difficulty of injecting plastic material from an axial gate through a central thin section into a thicker annular section and then into a thin outer section in the same plane.

Despite these slight differences in construction, all three of Northern's new low-temperature vaporizers function identically, each using the identical removable head, with the identical spacing tolerance between the lower end of the outer wall of the insulating chamber and the bottom of the bowl. The only difference is that the Model 1303, having a somewhat larger bowl, will run longer on one filling of water.

The Northern Models 1301, 1302 and 1303 were first shown at the January 1972 Housewares Show, and have been marketed since that time.

## INFRINGEMENT

### The '879 patent

Claims 3, 6 and 7 of the '879 patent are set forth in full in the margin.[1]

1. Claims 3, 6 and 7 of the '897 patent read as follows:

3. A vaporizer comprising a container having an opening, a cap positioned on said con-

tainer overlying said opening, said cap having a steam outlet therein, said cap including an upper wall, a heating chamber secured to and depending from said cap and extending into

Northern concedes that all three models of its accused vaporizers incorporate all of the elements recited in Claim 3 except "an upwardly extending rib * * * extending into engagement with [the] insulating chamber for restricting fluid flow from [the] heating chamber to a location * * * outwardly of said insulating chamber."

Northern's Model 1302, at least, clearly lacks any "rib" engaging the insulating chamber. The only portions of the bottom of the bowl which might conceivably be termed a "rib" are the sidewalls of the square depression in the bottom center of the bowl. But the outer wall of the insulating chamber is spaced some distance from these sidewalls at their closest point of approach—much farther than the lower edge of the outer wall is spaced from the flat portion of the bottom of the bowl within the depression, so that the sidewalls have no practical effect in restricting fluid flow from the heating chamber to the reservoir.

Kaz contends that the slightly raised annular ring in the bottom of the bowl of the Model 1301 and the slightly raised central plateau in the bottom of the bowl of the Model 1303 are both "ribs" within the meaning of the claims of the '879 patent, since both are circular projections formed in the bottom of the bowl for the express purpose of reducing the space below the edge of the outer wall of the insulating chamber and thus the fluid flow past that point. Northern responds that even if these elements might be called "ribs" they still do not extend "into engagement with [the] insulating chamber" as called for in the claims, but are spaced therefrom a slight distance (up to .050″). However, as already noted, this close spacing serves the same purpose as the "engagement" called for in the claims—that is, "restricting fluid flow from the heating chamber * * * outwardly." The two structures are clearly equivalent in the sense of employing substantially the same means, operating in substantially the same way to accomplish substantially the same result, so that Claim 3 would be infringed by the Models 1301 and 1303 under the doctrine of equivalents, *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 607–608, 70 S.Ct. 854, 855–856, 94 L.Ed.2d 1097, 1101–1102 (1950), unless there is a file wrapper estoppel which blocks resort to that doctrine. *Schriber-Schroth Co. v. Cleveland Trust Co.,* 311 U.S. 211, 220–221, 61 S.Ct. 235, 239, 85 L.Ed. 132, 137 (1940).

The application for the '879 patent as originally filed contained a claim (Claim 1) which incorporated all of the limitations of Claim 3 of the patent as issued, except the recitation of a rib engaging the insulating chamber to restrict fluid flow outwardly from the heating chamber. On the first official action, the Patent Examiner rejected that claim as "fully met by either Corbett [DeVilbiss' Corbett U.S. patent 3,518,409] or Swiss patent 452151." In the same action, application Claim 5 was tentatively indicated to be allowable. After Claim 1 was cancelled on the first amendment, Claim 5 was allowed as filed and became Claim 3 of the patent.

■ Having thus cancelled a claim which contained all of the limitations of Claim 3 except the one here in question, Kaz is estopped to contend that Claim 3

said container, said steam outlet being in communication with said heating chamber, an insulating chamber secured to said cap surrounding said heating chamber and having at least a portion thereof spaced from said heating chamber, said heating chamber having a liquid intake opening therein, an electrode assembly suspended from said cap and extending into said heating chamber, means for connecting said electrode assembly to a source of electrical power, said container having a bottom provided with an upwardly extending rib, said rib extending into engagement with said insulating chamber for restricting fluid flow from said heating chamber to a location in said container outwardly of said insulating chamber.

6. A vaporizer according to claim 3 wherein said rib is circular in shape.

7. A vaporizer according to claim 6, wherein said rib is closely spaced to said insulating chamber to permit only limited fluid flow.

should be interpreted so as to disregard that limitation. *Graham v. John Deere Co.*, 383 U.S. 1, 32–34, 86 S.Ct. 684, 701–702, 15 L.Ed.2d 545, 564–565 (1966).

But this does not mean that this limitation cannot be interpreted in the light of the patent specification. It is axiomatic that a patentee can be his own lexicographer and that the words of his claims must be interpreted as the specification makes clear that they were intended be. 1 Ellis, *Patent Claims,* § 30 (2d ed. 1971).

In the drawing of the '879 patent, the lower corners of the double-walled insulating chamber appear to touch the surfaces of two upwardly projecting ribs formed by annular folds in the material of the bottom of the bowl. But any such contact must not be continuous around the periphery of the wall to form a water-tight seal, because there is no other opening in the wall which would permit water to flow from the reservoir into the heating chamber to replace that which is evaporated. And the patent specification at column 2, lines 8–14, states

> "The container 22 is provided with a circular rib 23 which rises upwardly from the bottom of the container and is so arranged as to be *closely spaced from* the lower inner edge of the insulating chamber 52 so as to permit only minor flow of fluid from the exterior portions 68 of the container into the space 54." [Emphasis added].

And Claim 7 of the '879 patent, which is dependent upon Claim 3, recites that "said rib is closely spaced to said insulating chamber to permit only limited fluid flow." It is thus clear that the word "engagement" in Claim 3 was intended to include close spacing without actual touching.

In Northern's Models 1301 and 1303 vaporizers, the lower edge of the outer wall of the insulating chamber "engages" the raised portion of the bottom of the bowl in this same sense. The close spacing of the two surfaces, their unevenness and their almost unavoidable slight misalignment relative to one another, make it highly likely, if not practically unavoidable, that they will touch at one or more points around the periphery of the skirt. But this very unevenness and misalignment insures that, even if their nominal clearance is at the zero end of the tolerance range, there will still be the necessary clearance between them to allow a limited volume of fluid to flow from the reservoir into the heating chamber to replenish the latter.

However, because in the Model 1302 the bottom of the bowl has no projection that might conceivably be termed a "rib," there is no literal infringement of Claim 3 by that model. Moreover, because, as already noted, a claim which contained all of the features of Claim 3 except the rib was cancelled after its rejection on the basis of prior art, Claim 3 cannot be interpreted to cover a structure which lacks that element. It does not avail Kaz to argue that the Model 1302, considered as an entirety, is the functional equivalent of the complete combination recited in Claim 3, because equivalency must be determined on an element-by-element basis; there is no infringement unless the accused device contains every element recited in the claim or its equivalent. *Berkey Photo, Inc. v. Klimsch-Repro, Inc.,* 388 F.Supp. 586, 595 (S.D.N.Y.1975).

I therefore find that Claim 3 of the '879 patent is infringed by the Models 1301 and 1303, but not by the Model 1302.

Claim 6, which is dependent on Claim 3, adding only the limitation that the rib is "circular in shape," and Claim 7 which, as mentioned above, adds only that the rib and insulating are "closely spaced to permit only limited fluid flow," are likewise infringed by the Model 1301, which has a closely spaced annular ring and by the Model 1303, which has a closely spaced circular plateau.

*The '415 patent*

Claims 1 and 2 of the '415 patent, which are set forth in full in the

margin,[2] relate only to the cap-heating chamber-insulating chamber assembly and, because this assembly is identical in all three accused models, the three may be considered together for purposes of determining the issue of infringement of these two claims.

Northern concedes that Claim 1 is readable on its accused vaporizers, except for the portions which recite (1) that the inner and outer walls of the insulating chamber are "integral" with the horizontal portion and (2) that the insulating chamber is "separate" from the heating chamber.

In the accused Northern vaporizers, the inner and outer walls of the insulating chamber are molded as a one-piece, double-walled "shroud." The shroud is provided at its upper end with an integrally molded cylindrical collar which fits snugly around a cylindrical skirt depending from a "retainer" ring which has an outwardly projecting horizontal flange overlying the margin of the circular opening in the top of the bowl. The lower end of the heating chamber is substantially closed by an integral flat bottom having a small fluid inlet opening therein, and the shroud is secured to the heating chamber by a self-tapping screw which extends upwardly through a hole in the center of a bridge spanning the lower end of the inner wall of the shroud and into another small hole in the bottom of the heating chamber.

Northern contends that (1) since the "shroud" and the "retainer" ring are separately molded pieces, they are not "integral" as required by Claim 1, and (2) since the "shroud" is attached to the heating chamber by a screw, the two are not "separate" as further required by that claim.

I believe Northern is incorrect in both contentions.

Insofar as the operation of the device is concerned, it is wholly immaterial whether the walls of the insulating chamber and the horizontal supporting flange are molded as a single piece or as two pieces which telescope snugly together to form a substantially fluid-tight assembly. In either case, the structure performs precisely the same function in precisely the same way to achieve pre-

---

**2.** Claims 1, 2 and 4 of the '415 patent read as follows:

1. A vaporizer construction comprising a removable vaporizer head including a cap having a heating chamber depending therefrom and having a steam outlet in communication with said heating chamber, said heating chamber having an opening therein for receiving liquid from said vaporizer bowl, a vaporizer bowl comprising a container having an opening for receiving said heating chamber, said opening being defined by a peripheral edge, an insulating chamber assembly separate from said heating chamber and substantially coextensive with said heating chamber and including a substantially horizontal portion overlying said edge, at least a portion of said cap overlying said horizontal portion with said heating chamber received within said insulating chamber, said insulating chamber further including an inner wall integral with said horizontal portion for surrounding said heating chamber in spaced relation thereto, and an outer wall integral with and depending from said horizontal portion and surrounding said inner wall in spaced relation thereto.

2. A vaporizer construction in accordance with claim 1, wherein said vaporizer bowl includes means for engaging said insulating chamber for holding said insulating chamber in a predetermined position within said bowl, and means permitting liquid flow from said container to said heating chamber.

4. A vaporizer comprising a container having an opening, a cap positioned on said container overlying said opening, said cap having a steam outlet therein, a heating chamber secured to and depending from said cap and extending into said container through said opening, said steam outlet being in communication with said heating chamber, an insulating chamber in said container, said insulating chamber being wholly separate from said heating chamber, substantially coextensive therewith and surrounding said heating chamber, said heating chamber having a liquid intake opening therein, said container having a bottom provided with upwardly extending rib means, said rib means extending into engagement with said insulating chamber for restricting fluid flow from said heating chamber to a location in said container outwardly of said wall, and means in at least one of said insulating chambers and said rib means for permitting liquid flow from said container to said heating chamber intake opening.

cisely the same result. Thus, insofar as this element of Claim 1 is concerned, the claim is infringed under the doctrine of equivalents unless there is a file wrapper estoppel which precludes application of that doctrine. Northern does not contend that there is any such estoppel, and my review of the file history satisfies me that there is none.

With reference to the second contention, the insulating chamber and the heating chamber of the accused vaporizers are "separate" in the sense of being molded as individual pieces. They are also "separate" in the sense of being spaced apart—that is, having no common wall, and with the inner wall of the insulating chamber being spaced from the wall of the heating chamber. Thus the heat transfer from the heating chamber to the reservoir is reduced, which is the purpose of the "separate" relation of the heating and insulating chambers, as disclosed in the specification of the '415 patent. At Column 1, lines 31–44, it is stated:

"* * * because the present invention employs a separate insulating assembly, the inner wall of which is spaced from the heating chamber, a surprisingly and unexpectedly great reduction of the highest temperature [of the water in the bowl] has been made * * *."

Although in the accused Northern vaporizers, the insulating and heating chambers are held in assembled relation by the self-tapping screw, the contact area between them is very small, the heat conduction path through the bridge across the bottom of the inner wall of the insulating chamber is long, and the plastic material is an inefficient conductor, so that their mechanical interconnection has no significant effect on the temperature of the water in the reservoir.

I therefore find that Claim 1 is infringed by all three of the accused vaporizers.

Claim 2 of the '415 patent is dependent on Claim 1, adding only the recitation of "means for engaging [the] insulating chamber for holding [it] in a predetermined position with [the] bowl." In the structures disclosed in the '415 patent, this "means" is the annular rib in the bottom of the bowl. At Column 3, lines 1–3, the patent specification states:

"The bottom 59 of the container has a circular rib against which the inner wall 54 can bear so as to align the insulating chamber when it is inserted."

No such cooperation between the lower edge of the insulating chamber and the bowl of the accused Northern vaporizers was intended, and it has not been established that it occurs in practice. Just the contrary, Northern designed each of its devices to provide a clearance of up to .050 inch between these parts.

Claim 4 of the '415 patent, which is also set forth in full in footnote 2, is an independent claim similar to Claim 3 of the '879 patent, except that it adds

"means in at least one of said insulating chambers and said rib means for permitting liquid flow from said container to said heating chamber."

Of the several embodiments shown in the drawing of the '415 patent, only that of Figure 3 has any rib means in the bottom of the bowl. In this embodiment, notches 62 and 64 in the outer and inner walls, respectively, of the insulating chamber are provided for the stated purposes of permitting fluid flow from the reservoir into the heating chamber.[3]

The accused Northern vaporizers have no such openings in the walls of the insulating chamber or in the cooperating portions of the bottom of the bowl. However, the spacing between the lower edge of the outer wall of the insulating chamber and the bottom of the bowl in the accused devices is clearly the functional equivalent of the notch in the lower edge of the inner wall of the device

---

3. In fact, the notch 62 in the outer wall is wholly superfluous since the lower edge of the outer wall is spaced a substantial distance above the bottom of the bowl and fluid can flow without significant restriction through this space.

shown in Figure 3 of the '415 patent. Each serves precisely the same purpose of allowing controlled liquid flow from the reservoir into the heating chamber. What Northern has done, in effect, is to shorten the wall slightly all the way around its periphery instead of shortening it to a greater extent in a single, circumferentially limited area. And there is no file wrapper estoppel which would prevent application of the doctrine of equivalents so as to permit a finding that the accused devices incorporate the equivalent of this element of Claim 4.

But there is another and insurmountable obstacle to a finding of infringement of the claim. It requires "rib means extending into engagement with said insulating chamber for restricting fluid flow from [the] heating chamber to a location in said container outwardly of [the] wall."

As may be recalled, Claim 3 of the '879 patent, which contains the identical language, was found to be infringed only because the specification of that patent made it clear that the word "engagement" was intended to encompass not merely actual touching but also close spacing. The specification of the '415 patent contains no such direction but instead suggests exactly the opposite, as does the file history of the application for that patent.

The specification states at Column 3, lines 3–8:

"In order to permit fluid to pass into the space between the inner wall 54 and the heating chamber 12, an aperture 62 is provided in the outer wall 52 and an aperture 64 oppositely disposed to the aperture 62 is provided in the inner wall 54."

After the application for the '415 patent was filed but before the first official action, a preliminary amendment was filed adding a new Claim 12, which was substantially identical with Claim 4 of the patent as issued except for omission of any mention of means in either the

wall or the rib to permit fluid flow from the reservoir into the heating chamber.

On the first official action, the Patent Examiner asked, with specific reference to this claim, "How does water flow through the wall to the heating chamber?"

In the first responsive amendment, the applicants' attorney did not answer this question except tacitly by cancelling Claim 12 and adding a new Claim 16 which was identical except for adding a recitation of the missing means in the wall or rib for permitting such flow. If it had been contemplated that no such means was necessary because the lower end of the wall might be spaced from the rib, it would obviously have been preferable to say so, rather than amending the claims to require such means.

It is thus clear that the "engagement" contemplated by Claim 4 was one which involved actual, substantially water-tight contact between the wall and the rib, necessitating the provision of a notch or other opening in at least one of them to permit the necessary fluid flow. There is no such "engagement" between the wall and the bottom of the bowl in any of the accused Northern structures and accordingly no infringement of Claim 4 by any of them.

I am not insensible of the seeming incongruity in giving the term "engagement," as used in the '879 patent, a broad interpretation and, as used in the '415 patent issued on a continuation-in-part application, a strict construction. But the fault lies in the patentees' inconstant lexicography—the two differing definitions being clearly dictated by the respective patent specifications.

I therefore find that none of the claims of the '415 patent is infringed by any of the three accused Northern vaporizers.

*The '391 patent*

Claims 1, 2 and 3 of the '391 patent are set forth in full in the margin.[4]

4. Claims 1, 2 and 3 of the '391 patent read as follows:

1. A vaporizer heat insulating construction comprising in combination a vaporizer bowl

Claim 1, the only independent claim, contains all of the limitations of Claim 3 of the '879 patent previously discussed and all those of Claim 4 of the '415 patent. It adds the further limitations that the insulating chamber is "in non-contacting spaced relation to the heating chamber" and that it extends "from the bottom of [the] vaporizer bowl to [the] cap."

Northern contends that none of its accused vaporizers infringes Claim 1 for the reasons discussed above in connection with Claim 3 of the '879 patent and Claim 4 of the '415 patent, and for the additional reason that the insulating chamber does not extend all the way up to the cap, but is separated from the cap by a single-walled collar an inch or more in height.

The specification of the '391 patent is similar to that of the '415 patent insofar as concerns the implication that the "engagement" between the insulating chamber and the "rib means" on the bowl involves actual, substantially water-tight contact necessitating the provision of "means" in the insulating chamber to permit the flow of liquid from the reservoir into the heating chamber. Thus I find that in none of the three accused models is there "engagement" within the meaning of Claim 1 of the '391 patent.

Moreover, there is a file wrapper estoppel which would prevent interpreting Claim 1 of the '391 patent so as effectively to disregard this limitation. Claim 1 of the application for the '391 patent as filed contained all of the limitations of Claim 1 of the patent, as issued, except those respecting the "non-contacting spaced relation" of the heating and insulating chambers and the "engagement" of the insulating chamber with the rib in the bottom of the bowl. After Claim 1 had been rejected as fully anticipated by the Corbett U.S. patent 3,518,409, among others, it was cancelled and supplanted by a new Claim 12 which added these two limitations. This claim was allowed with only minor amendments and became Claim 1 of the patent.

It is therefore unnecessary for me to consider the other grounds of Northern's contention that Claim 1 is not infringed.

From the non-infringement of Claim 1 it of course follows that Claims 2 and 3, which are dependent upon it, are likewise not infringed.

## VALIDITY

### The presumption of validity

In patent infringement actions, the normal presumption is that the patents in suit are valid, with the defendant having the burden of establishing their invalidity. 35 U.S.C. § 282. The strength, and perhaps even the existence, of this presumption depends, of course, on whether the Patent Office had before it at the time it granted the patent the most relevant prior art. If it did, the presumption is reinforced. *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corporation*, 372 F.2d 263, 268 (2d Cir. 1967). If it did not, the presumption is weakened or negated altogether. *Julie Research Laboratories, Inc. v. Guildline Instruments, Inc.*, 501 F.2d 1131, 1136 (2d Cir. 1974); *Lorenz v. F. W. Woolworth Co.*, 305 F.2d 102, 105 n.7 (2d Cir. 1962).

having its bottom provided with at least one upstanding rib, a vaporizer head including a cap having a heating chamber depending therefrom, said heating chamber having heating means therein and an opening for receiving liquid from said vaporizer bowl, said vaporizer bowl having an opening for receiving said heating chamber, said opening being defined by a peripheral edge, a wall separate from and surrounding said heating chamber in non-contacting spaced relation thereto, said wall engaging said rib and extending from the bottom of said vaporizer bowl to said cap to divide the vaporizer bowl into an exterior portion and an interior portion, said wall having means therein for permitting restrictive fluid flow from said exterior portion of said bowl inwardly of said wall to said interior portion.

2. A vaporizer insulating construction according to claim 1, wherein said rib is circular and said wall is cylindrical.

3. A vaporizer insulating construction according to claim 1, wherein said rib surrounds the lower edge of said wall.

Here, as will be seen, there were several prior patents or generally contemporaneous devices which were not considered by the Patent Examiner during prosecution of the patent applications, and which disclosed or incorporated features which are not disclosed by any of the cited art and which were of critical significance in the allowance of the patent claims. The presumption is therefore entitled to little or no weight in this case.

## The evidence of obviousness

Defendants have attacked the validity of each patent on the principal ground that the patented invention would have been obvious at the time it was made to a person having ordinary skill in the art to which it pertains. 35 U.S.C. § 103.

In determining this issue of obviousness we must begin with the "background" considerations prescribed by *Graham v. John Deere Co., supra*:

> "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." 383 U.S. at 17, 86 S.Ct. at 694, 15 L.Ed.2d at 556.

## The prior art, the differences between it and the claimed inventions and the level of ordinary skill in the art

Because of the many common features of the inventions claimed in the three patents in suit, most of the prior art which is relevant to the first-filed '879 patent is also relevant to the later-filed '415 and '391 patents. A discussion of only four prior art devices will therefore suffice. And, since each involves a low-temperature electrolytic vaporizer having a bowl or reservoir for the water supply, an inlet opening at the top of the bowl closed by a removable cap, and a heating chamber depending from the cap and containing a pair of electrodes connected to opposite termi-

nals of a source of alternating current, these common features may be omitted in describing each.

## Corbett U.S. patent 3,518,409

The Corbett '409 patent, issued June 30, 1970 on an application filed in 1965 and assigned to DeVilbiss, discloses a vaporizer having an air-filled insulating chamber surrounding the heating chamber, the two chambers being formed by two concentric cylindrical walls, with the inner wall 15 of the insulating chamber being common with the wall of the heating chamber, and with both walls depending from the cap and being molded integrally with it. The bottom of the heating chamber is closed except for a small opening 17, which restricts fluid flow between the heating chamber and the reservoir.

## German Gebrauchsmuster 1,972,234

This German Gebrauchsmuster or petty patent, published November 9, 1967, discloses a vaporizer to which the entire foregoing description of the Corbett '409 device is equally applicable. However, in the German Gebrauchsmuster, the fluid flow from the heating chamber to the reservoir is further restricted by the close spacing of the lower edge of the outer wall of the insulating chamber from the bottom of the bowl.

Because of this latter feature, the Gebrauchsmuster is more pertinent to the invention claimed in the '879 patent than Corbett '409 or any of the other prior art cited by the Patent Office during prosecution of the application for that patent. It fully anticipates Claim 3 of the '879 patent except for the recitations (1) that the insulating chamber has "at least a portion thereof spaced from [the] heating chamber" and (2) of a "rib extending into engagement with said insulating chamber for restricting fluid flow from said heating chamber to a location in said container outwardly of said insulating chamber."

## The Norland vaporizer

As described hereinabove, the prototype vaporizer developed by Norland for

Northern included all of the features of the units disclosed by Corbett and by the German Gebrauchsmuster, plus a circular rib at the bottom of the bowl engaging the lower end of the outer wall of the insulating chamber to restrict fluid flow outwardly from the heating chamber. The Norland device is thus more pertinent to the invention claimed in the '879 patent than any of the art cited by the Patent Office.

The parties have devoted substantial segments of their briefs to argument as to whether the Norland device should be considered as part of the prior art against the patents in suit. Kaz contends that it should not be, because the tests of the device were not sufficient to constitute a reduction to practice, in that the temperature rise was measured only in runs of up to five hours' duration, whereas commercial vaporizers must run for at least 8, and preferably 12, hours. However, after the first several hours of operation of these devices, the temperature of the water in the reservoir tends to *decrease* as the water level drops, causing progressively shorter lengths of the electrodes to be immersed, thereby reducing the current flow and accordingly the heat generated thereby. Thus, insofar as the specifications for maximum reservoir temperature are concerned, a five-hour test is just as informative as an eight-hour or even longer test.

Therefore, if the issue were critical, I would be disposed to find that the Norland unit was conceived and reduced to practice before the filing date of the application for the '879 patent, and that it accordingly should be considered as part of the prior art against that patent under 35 U.S.C. § 102(g). However, it is really immaterial whether the Norland unit is deemed to be prior art, since it adds nothing to the German Gebrauchsmuster, which indisputably is prior art, except the rib engaging the outer wall of the insulating chamber. And, as discussed in connection with the issue of infringement of Claim 3 of the '879 patent, close spacing between the outer wall of the insulating chamber and the bottom of the bowl, as incorporated in the accused Model 1302 and in the German Gebrauchsmuster, is the functional equivalent of a rib in "engagement" with the outer wall.

██ Moreover, even if the Norland device is not *prior* art, it at least represents a substantially concurrent development. Such a generally contemporaneous and independent completion of the invention by another is at least some evidence that it was not beyond the reach of those of ordinary skill in the art. *Felburn v. New York Central Railroad Co.,* 350 F.2d 416, 426 (6th Cir. 1965), *cert. denied,* 383 U.S. 935, 86 S.Ct. 1063, 15 L.Ed.2d 852 (1966); *Barr Rubber Products Co. v. Sun Rubber Co.,* 277 F.Supp. 484, 492 (S.D.N.Y.1967), *modified,* 425 F.2d 1114 (2d Cir. 1970).

As previously noted, Claim 6 of the '879 patent adds nothing to Claim 3 except the recitation that the rib is "circular in shape," while Claim 7 adds nothing except the recitation that the rib is "closely spaced to [the] insulating chamber to permit only limited fluid flow." As also mentioned, close spacing to restrict fluid flow is taught by the German Gebrauchsmuster, and a closely spaced circular rib was incorporated in the Norland device to restrict fluid flow. This leaves the spacing of the insulating chamber from the heating chamber—i. e., the lack of any common wall—for at least a portion of the length of the heating chamber, as the only arguable innovation of the '879 patent. As previously noted, this feature was incorporated in one of the several versions proposed by Norland, and it is shown by the following patent:

*Corbett U.S. patent 3,637,978*

The Corbett '978 patent was issued January 25, 1972 on an application filed June 30, 1970. It thus antedates the applications for the '415 and '391 patents in suit but not the application for the '879 patent. It discloses a vaporizer in which an air-filled, double-walled, open-bottom-

ed cylindrical insulating chamber is formed integrally with the bottom of the bowl and extends upwardly therefrom in surrounding but spaced relation to the heating chamber which is attached to and depends from the cap.

Although the Corbett '978 patent is not prior art with respect to the '879 patent in suit, it at least represents an independent and generally contemporaneous development, since the Kaz vaporizers incorporating the structure of the '879 patent were not publicly disclosed until October 1971, over a year after the application for Corbett '978 was filed.

Corbett '978 and the Norland proposal together constitute persuasive evidence that the spacing of the insulating and heating chambers to reduce heat conduction between them was a logical and routine next step in the sequence of development of the low-temperature vaporizer. Just as Corbett and others had earlier recognized that the conduction of heat from the heating chamber to the reservoir through the single, common wall separating the two could be reduced by adding a second outer wall separated from the first by an air space, so it would seem an obvious extension of that principle to reduce conduction further by adding a third, intermediate wall so that the inner wall of the insulating chamber and the wall of the heating chamber are no longer common.

*The "secondary considerations" or "signposts"*

■ However, we have been properly admonished to avoid convenient but misleading resort to hindsight in resolving the difficult issue of obviousness, and instead to place principal reliance upon objective evidence bearing on that issue, particularly the history of the art before and after the invention. As stated in *Graham v. John Deere, supra,* 383 U.S. at 17–18, 86 S.Ct. at 694, 15 L.Ed.2d at 556,

"[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc.,

might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." 383 U.S. at 17–18, 86 S.Ct. at 694, 15 L.Ed.2d at 556, 148 U.S.P.Q. at 467.

These are what Judge Learned Hand called the "signposts" of patentability. *Reiner v. I. Leon Co.,* 285 F.2d 501, 504 (2d Cir. 1960), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961).

■ Quite significantly, there is not a single "signpost" which points in the direction of patentability here. This is the first patent infringement suit within my knowledge in which the plaintiff has introduced absolutely no evidence tending to show that the invention was not obvious to those of ordinary skill. There was no proof of a long-felt need or of unsuccessful efforts to fill it. Just the contrary, the record shows that within a few months after UL had indicated that it was lowering the maximum allowable temperature of the water in the reservoir of electrolytic vaporizers approved for listing, every substantial manufacturer of such vaporizers had been able to produce a complying device. Indeed, DeVilbiss had already done so several years earlier. And most if not all of them employed the same two simple expedients: interposing an air-filled insulating chamber between the heating chamber and the reservoir and restricting the flow of liquid between them. Nor was there any evidence that any experts were skeptical about the operability of vaporizers incorporating these changes, or surprised at the benefits achieved in their operation, which is hardly unexpected in view of the pedestrian nature of the changes.

There was, surprisingly, not even the usual proof of commercial success of the patented devices, much less any evidence of industry recognition of the patents by the acceptance of royalty-bearing licenses under them.

Essentially, all that Kaz did was to offer in evidence the patents themselves, explain where the several elements of the claims were to be found in the accused devices, and rest its case.

Thus there is not a shred of evidence to overcome the Court's *a priori* impression that the inventions were nothing more than the routine application of well-known principles. To the contrary, what "signposts" there are point unmistakably in the direction of obviousness.

I therefore conclude that Claims 3, 6 and 7 of the '879 patent are invalid for obviousness under 35 U.S.C. § 103.

### The '415 patent

The only portions of Claim 1 of the '415 patent which prevent the claim from being fully readable on the devices disclosed in the earlier '879 patent are the recitations (1) that the insulating chamber is "separate from [the] heating chamber" and (2) that the inner and outer walls of the insulating chamber are "integral with and depending from" the horizontal flange which overlies the edge of the opening in the top of the bowl.

The reduction of heat conduction from the heating chamber to the insulating chamber by forming them as two spaced, separate parts instead of a unitary molding would seem nothing but the most routine expedient and, indeed, was taught by the Corbett '978 patent, which is prior art against the '415 patent. Once the insulating chamber is made separate from the heating chamber, separate means must of course be provided to support it, and an integral flange overlying the edge of the top opening in the bowl is one of the most obvious ways of doing so, as evidenced by Corbett '409 and the German Gebrauchsmuster.

These prior patents disclose these features in combinations similar to that of the '415 patent. For example, the va-

porizer of the Corbett '409 patent fully anticipates Claim 1 except for the separation of the heating and insulating chambers, which is taught by Corbett '978. Thus the improvement over Corbett's '409 patent which he made in his later '978 patent was the same principal improvement over their earlier '415 patent which the patentees Katzmann and Briggin made in their '415 patent, and Corbett made that improvement first![5]

The obviousness of the improvement is further confirmed by the utter lack of "secondary" evidence of patentability.

Claims 2 and 4 of the '415 patent add only the feature of the rib engaging the insulating chamber to restrict fluid flow and to hold the insulating chamber in predetermined position within the bowl, as taught by the earlier '879 patent and as incorporated in the Norland prototype.

This old feature adds nothing to the patentability of Claims 2 and 4.

I conclude that Claims 1, 2 and 4 of the '415 patent are invalid for obviousness under 35 U.S.C. § 103.

### The '391 patent

The only portion of Claim 1 of the '391 patent which is not readable on the disclosure of the earlier '879 patent is the portion which recites that the insulating chamber extends from the bottom of the bowl to the cap.

This feature was disclosed by the German Gebrauchsmuster and was incorporated in the Norland prototype. Moreover, in the vaporizer of the Corbett '978 patent, the insulating chamber extends from the bottom of the bowl to a point well above the waterline where there can be no heat transfer to the water reservoir except indirectly through the inefficient medium of the air above it.

---

5. Although the application for the '415 patent was a continuation-in-part of the application for the '879 patent and is entitled, under 35 U.S.C. § 120, to the filing date of the parent application for all subject matter disclosed therein in the manner prescribed by 35 U.S.C. § 112, the two features under discussion were, as already noted, not disclosed at all in the parent application. Thus the patentees are limited, for purposes of testing the patentability of the combination in which the only asserted contribution to the art was the addition of these features, to the filing date of the '415 patent. Application of Van Langenhoven, 458 F.2d 132, 136–37, 59 CCPA 934 (1972).

486

Since it is notoriously old to place an insulating chamber around a heating chamber to prevent heat conduction from the latter, nothing would seem more obvious than to extend the insulating chamber so that it surrounds the full length of the heating chamber as taught, for example, by the German Gebrauchsmuster. No mechanical problems had to be solved to accomplish such lengthening of the insulating chamber, and none but the expected results were achieved.

In the total absence of secondary evidence of patentability, I am forced to conclude that Claim 1 of the '391 patent is invalid under 35 U.S.C. § 103.

Claims 2 and 4 of the '391 patent add only that the rib is circular and that it surrounds the lower end of the outer wall of the insulating chamber, both of which features were incorporated in the '879 patent and in the Norland prototype. They contribute no patentability to Claims 2 and 3, which must fall with Claim 1.

*Double patenting*

Having ruled all of the claims in suit invalid for obviousness, I need not discuss at length Northern's contention that the claims of the '415 and '391 patents are invalid on the ground of double patenting in view of the '879 patent. Suffice it merely to say that the filing of a terminal disclaimer in connection with the '415 patent has overcome any double patenting objection that might otherwise have existed, at least as to Claims 1 and 2, because they do not claim the same invention as the '879 patent in the sense that neither patent be infringed unless the other is. *Application of Vogel,* 422 F.2d 438, 57 CCPA 920 (1970); *Application of Eckel,* 393 F.2d 848, 55 CCPA 1068 (1968).

Since the application for the '391 patent was copending with the application for the '879 patent and, indeed, was a continuation-in-part thereof, it is only

the claims of the '879 patent which should be considered in determining the issue of double patenting, with the specification being looked to only as an aid in construing the claims. *Application of Schneller,* 397 F.2d 350, 352, 55 CCPA 1375 (1968). Since the claims of the '391 patent define a modification over the structures claimed in the earlier copending patents which apparently was made after the filing date of the application for the '879 patent but before that of the '415 application, two different tests of double patenting must be applied: (1) whether the invention claimed in '391 was an "obvious variation" of that claimed in '879, *Application of Vogel, supra,* 422 F.2d at 441, and (2) whether it is "independent and distinct" from that claimed in '415. *Application of Schneller, supra,* 397 F.2d at 354–55. Fortunately, I am spared the necessity of gauging the inventions with those limp calipers. However, a quick eyeball estimate inclines me to feel that the '391 patent would fail the latter test even if not the former, *cf. Schneller, supra,* and that, absent a saving terminal disclaimer, it is invalid on the further ground of double patenting.

## SUMMARY

Claims 3, 6 and 7 of the '879 patent are not infringed by Northern's Model 1302 vaporizer; they are infringed by Northern's Models 1301 and 1303 vaporizers, but are invalid.

Claim 1 of the '415 patent is infringed by all three accused Northern vaporizers, but is invalid. Claims 2 and 4 of the '415 patent and Claims 1, 2 and 3 of the '391 patent are not infringed by any of the accused Northern vaporizers and are invalid.

The complaint is dismissed with the usual taxable costs, but without attorneys' fees.[6]

## SO ORDERED.

**6.** I find that this is not an "exceptional case" within the contemplation of 35 U.S.C. § 285, but was brought and prosecuted in good faith. Although Kaz's president, Katzman, apparently overwhelmed by pride of creation, and by a

parent's fierce instinct to protect its offspring, sought patents on every innovation, however mean, he somehow did obtain such patents and at least some of their claims did read on the Northern vaporizers.