CBS, INC., Appellee,

v.

LOGICAL GAMES, Appellant.

No. 83–1180.

United States Court of Appeals,
Fourth Circuit.

Argued Aug. 30, 1983.

Decided Oct. 12, 1983.

Rehearing and Rehearing En Banc
Denied Nov. 21, 1983.

Aaron B. Karas, Watson, Cole, Grindle & Watson, Washington, D.C. (Gerald E. Baker, Manassas, Va., on brief), for appellant.

Dean C. Dunlavey, Los Angeles, Cal. (Lewis H. Eslinger, Dickerson M. Downing, Eslinger & Pelton, P.C., New York City, on brief), for appellee.

Before WINTER, Chief Judge, MURNAGHAN, Circuit Judge, and BUTZNER, Senior Circuit Judge.

MURNAGHAN, Circuit Judge:

The facts of the case are essentially simple, so simple, indeed, that the parties were able to stipulate them, allowing the jury to be dismissed, leaving only law matters for the district court to rule on and for us to consider on appeal.

So far as the fusillade of legal charges is concerned, however, things are not simple. We have CBS, Inc., the successor by acquisition of Ideal Toy Corporation, suing Logical Games, Inc., a company for which the dominant personality has been Bela J. Szalai. There were charges of trade mark infringement, unfair copying of trade dress, common law unfair competition under Virginia law, violation of the Virginia Consumer Protection Act, and violation of § 43 of the Lanham Act. Injunctive relief was sought by CBS, Inc. Counterclaims by Logical Games, Inc. were brought on theories paralleling those relied on by the plaintiff, as well as for anti-trust violations.[1] The defendant made a claim for declaratory judgment of no infringement, by Logical Games, Inc., infringement by CBS, Inc., a claim for trade mark or trade dress disparagement and a claim for abuse of process.

Boiled down to its essentials, the case concerns marketing in the United States of an intriguing puzzle invented in 1975 by Erno Rubik, a Hungarian living in Budapest, most widely known by its trade mark, "RUBIK'S CUBE" when produced and marketed by CBS, Inc. (Logical Games, Inc. has sold a similar device under the name of "MAGIC CUBE", the English

---

1. The anti-trust counterclaims were, however, dismissed without prejudice.

equivalent of the Hungarian term, "BU-VOS KOCKA", employed for sales in that country.) [2]

In 1978, Szalai, visiting his native land of Hungary, saw examples of the intriguing puzzle, realized the potential for sales thereof in the United States and, on September 13, 1978, ordered 1000 puzzles from the Hungarian manufacturer, Politechnika Ipari Szovetkezet. Following receipt thereof, in March 1979, Logical Games, Inc. began sales in the United States. There was an additional order by Logical Games, Inc. made to Konsumex Foreign Trade Company, the Hungarian sole exporter of the puzzle, in August or September 1979 for 2000 puzzles. By February 1980, all 3000 puzzles bought from the Hungarian source had been disposed of in the United States.[3] Logical Games, Inc. also made inquiry of the Hungarian distributor, Konsumex, about the possibility of acquiring exclusive rights of export to the United States, but found the asking price of $1,000,000 placed on that right too high and discontinued inquiries along that line.

In September or October, 1979, Konsumex entered into an exclusive distribution agreement for the United States with the Ideal Toy Company (predecessor in interest to CBS, Inc.). The importation into the United States of the puzzle by Ideal Toy Corporation, accompanied by extensive advertising began in February or March 1980. About 16,000,000 have been sold by Ideal Toy Corporation and its successor CBS, Inc., with advertising expenditures totalling approximately $2,600,000.

Logical Games, Inc. having enjoyed success in the nonexclusive transactions engaged in by it, the resale of the Hungarian produced puzzles which appeared in the dress employed by the Hungarian manufacturer (although for most the packaging was changed), decided to manufacture on a subcontracting basis the item in the United States. It ran no risk of patent violation inasmuch as no patent was ever filed for in the United States, nor does either party assert any patent rights. Sales by Logical Games, Inc. since May 1980 of puzzles manufactured under the control of Logical Games, Inc. in a dress conceded to be confusingly similar to that employed on puzzles distributed by Ideal Toy Corporation, have amounted to approximately 25,000 in number.[4]

An objective of the puzzle is to obtain the lining up of small cubes (which together combine to form a larger cube) in such a way that all with the same characteristic are located in the same plane. The trade dress employed by the Hungarian manufacturer used black and white as face markings. Some manufactured by Logical Games, Inc. also used a black-based dress, conceded by it to be confusingly similar with the dress employed on puzzles marketed in the United States by CBS, Inc. In some of its production, Logical Games, Inc. used a light blue in lieu of white. The district court concluded that the slight change in color did not eliminate the confusing similarity and we are satisfied that such a finding is not clearly erroneous and should not be disturbed.

Logical Games, Inc., realizing the impropriety of using the trade mark employed by CBS, Inc., "RUBIK'S CUBE", adopted as a trade mark "MAGIC CUBE". However, while that eliminated trade mark infringement in its most glaring form, it merely

2. While a different trade mark was employed, a trade dress employed by Logical Games, Inc. concededly was confusingly similar to that employed by CBS, Inc. and *vice-versa*.

3. The sales results of Logical Games, Inc. were achieved with a relatively small amount of advertising, none on television, one paid advertisement in the September 1979 issue of a magazine enjoying a circulation of 32,200. There was also free promotion in a magazine issue for November/December 1979 with a circulation of approximately 576,000. Solicitation letters to prospective retail vendors appear to have been the primary marketing technique.

4. All in all, the district judge found, and his determination is by no means clearly erroneous, that "[w]hile Logical had made minimal sales and done some advertising ..., there is just insufficient evidence for the court to find any association by the public of the Magic Cube puzzle with a single source to support a secondary meaning, incipient or otherwise."

shifted the battle to the trade dress area, inasmuch as the identifying color scheme did, according to market surveys obtained by CBS, Inc., lead to a mistaken identification in the minds of consumers of the CBS, Inc. product and the product of Logical Games, Inc.

The principal contention of Logical Games, Inc. is that its purchase in Hungary in 1978 and subsequent sale of 3,000 puzzles in the United States conferred on it an exclusive right to the trade dress in which the puzzles it purchased from Konsumex, the Hungarian exporter, appeared, entitling it to injunctive relief against use by CBS, Inc. While factual situations can be imagined in which extensive—especially reiterated—purchase abroad and marketing in the United States might operate to create in the American importer trade dress rights in the United States for a format employed elsewhere by the foreign manufacturer, in the present case the drawing of such an inference would be altogether unjustified.[5] *Royal Silver Mfg. Co., Inc. v. National Sil-*

*ver Co.,* 61 F.Supp. 232, 236 (S.D.N.Y.1945) (use for about 30 years, together with extensive advertising); *Wrist-Rocket Mfg. Co., Inc. v. Saunders Archery Co.,* 516 F.2d 846 (8th Cir.1975), *cert. denied,* 423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100 (1975) (initial use by distributor, preceded any use by the manufacturer, and continued on an essentially exclusive basis for 17 years).[6]

In all events, the district judge has drawn no such inference. In short, Logical Games, Inc. has cited no case coming close to supporting the proposition that, by its minimal purchases of puzzles and resale of them in the United States, it acquired rights in the trade dress or developed defenses against assertion of rights therein by others, CBS, Inc. in particular.[7]

To put things in perspective, we accept the assertion by Logical Games, Inc. that "trade dress use in foreign countries does not create protectible trademark rights in the United States." *Cf. La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1270 n. 4 (2d Cir.1974).[8]

**5.** *Columbia Mill Co. v. Alcorn,* 150 U.S. 460, 14 S.Ct. 151, 37 L.Ed. 1144 (1893) cited by Logical Games, Inc. is of no assistance here, going off on the point that exclusive rights to use for marketing purposes may not be obtained in a term of geographical identification.

**6.** It should not be overlooked that Logical Games, Inc. chose not to pursue the possibility of a contract with the Hungarian supplier or manufacturer, which might have placed an entirely different complexion on matters. *See, e.g., E.F. Prichard Co. v. Consumers Brewing Co.,* 136 F.2d 512, 520 (6th Cir.1943) ("On this phase of the controversy, the law of contract is controlling, rather than principles applicable to trade-mark law; and there appears no reason why a party, commencing a business, cannot secure a right to a trade-mark which he adopts in the incipient stage of a new enterprise.").

**7.** Neither party has alluded to the law merchant, "regulat[ing] the dealings of merchants and mariners in all the commercial countries of the civilized world." Bouvier's Law Dictionary, Rowle's Third Edition, p. 1882. Perhaps it is inappropriate to do so, considering that Hungary now is embarked politically and economically on a course which does not allow customary free play to market forces. Nevertheless, we are dealing with the applicable law in the United States, and may venture to conclude that traders the world over would not expect

any rights, especially those exclusive in nature, to carry over beyond the particular transaction when goods are simply bought sporadically in one country or geographical area and sold in another. Especially is that expectably the case when the purchaser has approached the manufacturer or distributor, the parties most reasonably to be regarded as exercising supervisory control over such rights, about obtaining them, and then consciously has taken a decision not to pursue the possibility. That is not, of course, to say that repeated occurrences, over a substantial period of time, involving considerable numbers of items could not operate, even in the absence of agreement, to give rise to exclusive rights. However, the district judge made clearly supportable findings that rights by user of that kind had not come into being, and to call those findings clearly erroneous would be to rip the fabric of the law in an essential place.

**8.** In *La Societe Anonyme des Parfums Le Galion,* the usage to which that of Logical Games, Inc. would be analogized was insufficient to create rights in it. The use was "nominal", "sporadic", "casual", "transitory", "minimal", and "meager."

Other cases cited by Logical Games, Inc. involve situations where there was not a confusing similarity, *Buitoni Foods Corp. v. Gio. Buton & C.S. p. A,* 530 F.Supp. 949 (E.D.N.Y. 1981), or where well exploited, extensive, con-

Here, however, conceding that there were no American user rights in the Hungarian manufacturer or exporter, or in Ideal Toy Corporation and its successor CBS, Inc., until exportation to and distribution in the United States by them had commenced,[9] nevertheless, although lacking the user rights, prior to actual distribution in the United States, the Hungarians did not lose the right to establish such rights. Such a loss of the rights would have occurred only if Logical Games, Inc. were to have taken sufficient steps to appropriate such rights. The importation of 3000 puzzles, employing a trade dress, for which Logical Games, Inc. could claim no originating responsibility, simply was insufficient to create the user rights claimed by Logical Games, Inc. Consequently, CBS, Inc., in whom reposed all interests of the Hungarian manufacturer and exporter had still the right to create, by importation to and distribution in the United States, an exclusive prior claim to the trade dress here at issue. CBS, Inc. did so through extensive use in the United States, and that provides the solution to the legal puzzle with which we have been challenged by the parties.

Logical Games, Inc. saw a product complete in its preparation by the Hungarian manufacturer, who plainly possessed, and did nothing to surrender, the trade dress chosen for the puzzles. The right to the trade dress on items marketed in the United States did not arise in Logical Games,

Inc., whose use was minimal, so regardless of when it came into existence it was Ideal Toy Corporation, not Logical Games, Inc. who established user rights in the United States.

Once that basic conclusion has been reached, everything falls into place. Disparagement by CBS, Inc. of a non-existent trade dress in Logical Games, Inc. is logically impossible. Abuse of process falls of its own weight, given the decisions in CBS, Inc.'s favor. We are not disposed to .interfere with the conclusions of the district court that the trade dress when employed by Logical Games, Inc. was not inherently distinctive nor possessed of a secondary meaning. We also find unpersuasive the contentions that, by its contractual undertakings with the Hungarians, CBS, Inc. did not obtain trade dress rights as distinct from trade mark rights, or that the grant was so uncontrolled and all-encompassing as to be void. The right of CBS, Inc. to establish thereafter through use in the United States exclusive access to the extant trade dress exploited in other countries by the Hungarians flows implicitly and automatically from an exclusive arrangement for the sale of cube puzzles in the United States.

The injunctive relief granted to CBS, Inc. was proper. CBS, Inc. has not pursued a claim for monetary damages. Denial of the relief requested by Logical Games, Inc. also follows.

tinuous, enduring use in the United States by a trademark owner had occurred and the fact of use in Cuba, France or Italy was not allowed to interfere with the right of the owner to use the registered mark in this country, *Johnson & Johnson v. Diaz,* 339 F.Supp. 60 (C.D.Cal.1971); *LeBlume Import Corp. v. Coty,* 293 F. 344 (2d Cir.1923); *Coty, Inc. v. Parfums de Grande Luxe,* 298 F. 865 (2d Cir.1924), *cert. denied,* 266 U.S. 609, 45 S.Ct. 94, 69 L.Ed. 466 (1925); *Cooper's Incorporated v. Jockey Shoe Polish, Inc.,* 149 USPQ 704 (P.O.T.T.A.B 1966); *Scotto v. Mediterranean Importing Co., Inc.,* 162 USPQ 415 (P.O.T.T.A.B 1969). Each of those cases involved marks originating from two separate, distinct and competitive sources. Here, of course, we consider a situation where the dress originated with a single source, Konsumex. That creates a very different set of circumstances where total disregard of foreign

use might not be appropriate. We need not, however, investigate that potentially difficult question in light of our conclusion that, based on use in the United States alone, the rights of CBS, Inc. prevail over the claims of Logical Games, Inc.

**9.** We do not pursue the claim of CBS, Inc. that, assuming Logical Games, Inc. did succeed in achieving a secondary meaning by its sales activities in the United States relating to the 3000 puzzles, that right inured, under the circumstances of the case, to the Hungarians whose puzzles and dress therefor, imported by Logical Games, Inc. on a non-exclusive basis, had been the operative considerations from which the rights had arisen. CBS, Inc. contends that the right, once it was located in the Hungarians, passed under the terms of their exclusive contract, to Ideal Toy Corporation.

Accordingly, the judgment of the district court is

AFFIRMED.